JM:SJM
F.#2011R01982

**M11-1182**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

LOUIS DION,

          Defendant.

- - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, *SS*:

       KURT F. DENGLER, being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"), duly appointed according to law and acting

as such.

       Upon information and belief, there is probable cause to

believe that on or about and between November 4, 2011 and

November 30, 2011, both dates being approximate and inclusive,

within the Eastern District of New York and elsewhere, the

defendant LOUIS DION, together with others, did knowingly and

willfully conspire to use and employ manipulative and deceptive

devices and contrivances contrary to Title 17, Code of Federal

Regulations, Section 240.10b-5 ("Rule 10b-5"), by (i) employing a

device, scheme, and artifice to defraud; (ii) making untrue

statements of material fact and omissions of material fact

necessary in order to make statements made, in the light of the

circumstances under which they were made, not misleading; and

(iii) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of certain securities, contrary to Title 15, United States Code, Sections 78j(b) & 78ff, and Rule 10b-5.

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:

## BACKGROUND

1.  I have been a Special Agent with the FBI for approximately 13 years. During this time, I have participated in numerous investigations and prosecutions of securities fraud.

2.  The facts set forth in this complaint and affidavit are based in part on my review of reports and records, including consensually-recorded conversations, interviews of individuals, bank records, trading records, publicly-filed documents and other publicly-available information, and conversations with other law enforcement agents. Where the contents of consensually-recorded conversations and interviews of individuals are reported herein, they are reported in substance and in part, except where otherwise indicated.

2

3.   Because I submit this complaint and affidavit for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth all facts known to me about this investigation and case.

## RELEVANT ENTITIES AND INDIVIDUALS

4.   SIGA Resources, Inc., ("SGAE"), a Nevada corporation, was a publicly-traded company with the stock ticker symbol "SGAE" that was traded on the NASDAQ Over-the-Counter exchange.  SGAE's securities were registered with the United States Securities and Exchange Commission (the "SEC").[1]  SGAE claimed it was a mineral exploration company, which was still in the pre-exploration stage of its business.  In the month of October 2011, SGAE was trading at between 80 cents and $1.40 per share.  In the month of November 2011, SGAE was trading at between 22 cents and 75 cents per share.  Daily trading volume from August through November 7, was typically less that 20,000 shares per day.

5.   LOUIS DION was a Canadian citizen, residing in Vancouver, British Columbia.  DION and his confederates own or control the vast majority of the shares of SGAE.

---

[1]   The SEC was an agency of the United States charged by law with protecting investors by regulating and monitoring, among other things, the trading of Over-the-Counter ("OTC") securities, including penny stocks, that were quoted on the Pink Sheets, www.pinksheets.com, and on the OTC Bulletin Board, www.otcbb.com. A penny stock was in general any equity security that had a price of less than five dollars.

3

## THE FRAUDULENT SCHEME

6.    On or about and between November 4, 2011 and November 30, 2011, DION, along with others, conspired to engage in a scheme to defraud investors by paying kickbacks to stockbrokers so that the brokers would purchase SGAE stock on behalf of their unwitting clients, which would allow LUIS DION and his co-conspirators to liquidate their ownership of SGAE at artificially inflated share prices.[2]

7.    To accomplish this, DION and his co-conspirators manipulated the trading volume of SGAE to create the false and misleading appearance of active trading in the stock and the false and misleading appearance that the market had an interest in the stocks by (a) conducting "matched trades," which were orders to buy or sell securities entered with knowledge that a prearranged matching order on the opposite side of the transaction has been or will be entered; (b) "walking up" or maintaining a price for the SGAE stock by buying and selling the stock in a coordinated manner; and (c) agreeing to pay undisclosed kickbacks to stockbrokers to induce the brokers to fraudulently create demand for SGAE stock at inflated prices.

---

[2]    In addition to the SGAE stock, for which trades and kickbacks were actually made, as set forth below, DION discussed a handful of additional stocks that he and his co-conspirators controlled and sought to run the same scheme with respect to these additional stocks.

4

8.   DION and his co-conspirators coordinated this kickback scheme through an individual whom they believed to be the point person for the corrupt stockbrokers, but who was in fact an undercover agent of the FBI (the "UC"). After arranging to have the UC direct his stockbrokers to purchase SGAE stock being sold by DION and his co-conspirators who were liquidating their interest in SGAE, DION and his co-conspirators wired the kickback money to the UC's designated bank account.

9.   DION and his co-conspirators directed the UC to purchase the SGAE stock and provided the kickbacks set forth in the table below.

| Date | Shares | Price per Share | Total Price | Total Kickback |
|------|--------|-----------------|-------------|----------------|
| 11/21/11 | 72,000 | $.2685 | $19,137.60 | $10,000 (11/21) |
| 11/23/11 | 91,000 | $.325 | $29,575 | $8,000 (11/29) |
| 11/28/11 | 110,000 | $.46 | $50,600 | $8,000 (11/29) |

## A.   The November 21, 2011 Buy

10.   The UC, who purported to represent a group of corrupt stockbrokers, engaged in several consensually recorded conversations with defendant DION. During these conversations, DION recruited the UC and, through the UC, the stockbrokers, to assist in the scheme to manipulate SGAE's stock price and liquidate DION and his co-conspirators' interests in SGAE stock.

5

11.   On or about November 18, 2011, the UC called DION
and advised him that his stockbrokers were interested in
purchasing SGAE.  He then inquired whether DION was willing to
pay a 50 percent kickback ("Are you good with a 50 point fee
here?").  DION agreed to the 50 percent kickback.  The UC then
went on to explain who his corrupt stockbrokers represented:
"Basically . . . these guys that I am using on this are big,
private client services guys . . . .  They've got big time
accounts and they are willing to allocate some of those funds
into these stocks.  So, bottom line is, from my perspective, it
doesn't matter to me what price we are doing the buying at . . .
.  I'll buy two million dollars worth of stock at $.58 [per
share] or I'll buy two million dollars worth of stock at $.70
[per share], we'll just back into the shares."  Based on my
training, experience and knowledge of the investigation, the
price of the shares does not matter in this scheme because the
goal is to get DION and his co-conspirators out of their two
million dollars worth of stock at whatever price they need to,
and that without the corrupt brokers, there would be no market to
sell the shares anywhere near the prices that are being
discussed.  Moreover, as soon as the shares began to be sold, the
price would be expected to drop without the artificial demand
created by the corrupt stockbrokers and it would have been
impossible for them to liquidate their shares at any price.

Based on my training and experience, there is no legitimate reason to pay a stockbroker or promoter a fifty percent fee for services relating to the purchase of stock.

12.   In order to be sure that the UC's purchases of SGAE stock were liquidating DION and his co-conspirators of their stock, rather than simply buying out the stock of others not involved in the conspiracy, DION and his co-conspirators coordinated their offers to sell with the UC's offers to buy.  On November 19, 2011, the UC advised that he was going to start off by buying $20,000 worth of SGAE stock.  DION sought to make sure that the UC would be buying his shares and asked: "when you say drop twenty grand, do you mean just go into the market or do you want us to be there offering on the twenty grand?"  The UC replied, "I would say that we definitely want you offering because I want to take you out of your position."  DION responded, "Right.  Sure."  The UC then asked DION, "Is it you that controls the selling?"  DION replied, "Yup, we've got control of it here."

13.   DION and the UC also discuss steadily increasing the amount of SGAE stock that the brokers would be purchasing. DION asked, "So, what size next time are you thinking . . . ." The UC responded, "I'm thinking we'll do . . . just kick it up a small amount, like 30 grand, then maybe the next time, thirty, forty, fifty . . . and then keep ratcheting it up."  DION

replied, "Ok." Based on my training and experience, it is
necessary to make a number of purchases at moderate volume before
making larger purchases in order to avoid intense scrutiny by
securities' regulators. Thus, while DION and his co-conspirators
were looking for the UC to buy out millions of dollars worth of
their shares in SGAE, they need to increase the volume of these
transactions slowly, at least at first. In order to provide
further cover and legitimacy to the transactions, DION and the UC
discussed DION's ability to have the company (SGAE) put out press
releases that would justify the corrupt brokers' purported
interest in purchasing so many shares. For example, in a
recorded call on November 29, 2011, DION told the UC that he
would direct SGAE to issue press releases every two days starting
on December 2, 2011. They also discussed the timing of these
press releases. DION asked, "Do you want it [the press release]
after the market closes Friday or before the market opens?"
Based on my training, experience and knowledge of the
investigation, the other benefit of slowly increasing the amount
of shares purchased, is that this would indicate to the market
that there was interest in the stock, which could create demand
for it, thus causing the price of the shares to increase.

14. On November 21, 2011, DION and the UC coordinated
the UC's purchase of the first set of shares as set forth in the
table above. In order to be sure that the UC was liquidating

8

DION and his co-conspirators of their shares, they coordinated
the UC's bid to match DION's offer to sell. During a recorded
conversation, DION and his co-conspirators advised the UC that
their offering price to sell was at $.29 cents per share on the
OTC market. The UC then asked, "So . . . if I put an order in at
$.29 [per share], will it get filled by you guys?" One of the
co-conspirators who was on the phone call on DION's end ("CC-1")
responded, "We're good at that level . . . can you direct a
trade?" The UC responded, "I can't. The trader doesn't know
what we're doing here, only the broker." The UC meant that
trades placed by the brokers under his control were actually
executed by traders at the brokerage firms, not the brokers
themselves. If a trader was a knowing participant in the
fraudulent scheme, then the trader could ensure that he purchased
the stock of DION and his co-conspirators. But, here, in the
UC's scenario, the traders were not co-conspirators, meaning that
the broker could direct the price at which to purchase the stock,
but could not control from whom the actual shares were purchased.
As a result, DION and the UC had to coordinate the UC purchase
bid to match DION's offer to sell price to ensure that DION and
his co-conspirators shares were liquidated by the UC's purchase.

        15.   During this same call on November 21, 2011, after
the UC said he will immediately make the trade as discussed, DION
stated, "And then once it's done [the trade], we'd like to . . .

CC-1 says we can pay . . . direct . . . send the money today."
Based on my knowledge of the investigation, DION was promising to
send the kickback payment that same date, which was in fact done.
After the trade was completed, DION and the UC had another
recorded call that same date and DION said, "it was $18,720 . . .
so what we want to do is send you ten, just to round numbers off
in good faith." The UC responded, "Perfect." Based on my
knowledge of the investigation, DION had agreed to pay a fifty
percent kickback to the UC and his corrupt brokers for the
purchase of the SGAE stock. A $10,000 wire was in fact
transmitted by DION and his co-conspirators to the bank account
to which the UC directed Dion to send payment on November 21,
2011.

        16.  DION and the UC similarly coordinated the UC's
purchases of additional SGAE stock on the two other occasions as
set forth in the table above. After the purchases, DION and his
co-conspirators again wired the kickbacks to an account
identified by the UC.

        17.  After the three moderate purchases, DION and the
UC discussed their plans to have the UC's corrupt brokers
purchase a total of $30 million worth of the SGAE stock owned by
DION and his co-conspirators. In discussing the logistics of
these larger volume trades, DION advised the UC that he could
assist him in obtaining an overseas bank account. Based on my

training and experience, an overseas bank account would help prevent securities regulators from uncovering the fraudulent scheme and insulate the proceeds of the fraudulent scheme from seizure by law enforcement. In addition, DION and the UC discussed other methods to prevent regulators or law enforcement from detecting the fraudulent scheme. For example, during a recorded call on November 28, 2011, the UC mentioned that once they start buying larger quantities of the stock he was going to have to use four different brokerage firms.

## CONCLUSION

18. Given the confidential nature of this continuing investigation, I respectfully request that this complaint and affidavit be maintained under seal until this court or another court of competent jurisdiction orders otherwise, except that Special Agents of the FBI may disclose this complaint and affidavit and the arrest warrants as necessary to effectuate the arrest and arraignment of the defendants.

11

WHEREFORE, your deponent respectfully requests that the defendant LOUIS DION, be dealt with according to law. .

KURT F. DENGLER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of December, 2011

_____
United States Magistrate Judge
Eastern District of New York